Mr. Cutchins, are you arguing the Batson question? I am, Your Honor, on behalf of both appellants. And you'll go first? Yes, Your Honor. Okay. And then Mr. Tamor. Tamor. Tamor. Okay. Okay. You represent McDaniels. Your Honor, yeah, I'm A.J. Cutchins, and I represent Appellant Jenkins. But I'm arguing the Batson question on behalf of both. May it please the Court. The heart and soul of the – oh, excuse me. Before I start, I would like to try and reserve four minutes for rebuttal. I'm mindful of what Judge Bidey said at the inception, but to the extent the Court can aid me, I'd appreciate it. The heart and soul of the State's response to Appellant's Batson claims is that this Court must defer to the State court of appeals. But the State court simply did not undertake the analysis required by Batson. In fact, it disabled itself from doing so. As a result, there's nothing for this Court to defer to there. Batson teaches that a reviewing court may not reject a plausible claim that jurors have been eliminated on the basis of race unless and until that court has undertaken a sensitive inquiry into the totality of the relevant facts and all the relevant circumstances. It doesn't seem to – I don't know what a sensitive inquiry is. I've sat as a trial judge, and I don't know what sensitive means. I understand inquiry, but has that ever been defined of what a sensitive inquiry is? A sensitive inquiry. Well, it's an evocative term, but I think we can simply say that the Court has to look at all the totality of the – every fact in the record that could bear on whether or not there was discriminatory intent in the selection of the jury. I'm not stuck on the word sensitive. I understand what you're saying, Your Honor. Okay. Mr. Cutchins, is the error here the California court of appeal, or is it the trial court, or both? Who should have done the – who should have done what? Both should have looked at all of the facts in the record, including undertaking a comparison of the jurors who were struck and the jurors who weren't. Was it physically possible for the California court of appeal to have conducted the comparative analysis? No, because the California court of appeal did not assemble the record, necessarily. And was it – Well, when we talk – excuse us. Oh, go ahead. Please go on. When we talk about issues up here, there's a responsibility. We never feel we have to go down and get a record. It's up to counsel to get the record. So I didn't understand your argument that they didn't sui sponte go get the record. It's defense responsibility to get that record, to make it and bring it forth. Well, thank you, Your Honor. I'm glad you raised that, because there's an enormous difference between the Federal system and the California system. Indigent criminal appellants in the Federal system designate a record. They can fill out a voucher. The transcripts are produced. They're sent up. That's not how it works in California. In California, there is, by rule, the normal record on appeal that is automatically created. It is sent to the court. It is sent to the parties. If anybody wants anything more than that, only this – only the court of appeal has the authority to order anything outside of, quote, the normal record on appeal. So the lawyer, sensing what he has to prove, has to move the court of appeal to get it. That's the only way that that record is going to come up, yes. Did – was there a motion made to the court of appeal to get certain records that the court of appeal refused? No, Your Honor. And to my knowledge, there was no motion that was refused, but – and it may be that the appellant's court-appointed State appellate lawyer, who, by the way, has since been disbarred for incompetently representing indigent defendants, she perhaps could have been more aggressive about pressing the State court. But there's no reason. More aggressive? She didn't ask for the record at all? Right. Well, she asked for some record, I believe, but not all of it. So do we blame the court of appeal for the counsel not doing their responsibility? It would have been a futile gesture, Your Honor. That's, I think, the bottom line. There's no finding on that. There is, in fact, this Court's decision in Boyd v. Newen, which recognized that this exact same California court of appeal during this exact same period as a matter of policy refused, refused to order up a complete voir dire because it's – it believed itself not required. But that didn't happen in this case. It didn't happen in this case, but it would have been – Doesn't it mean that this record – don't we have to deal on the record before us? Well, Your Honor, I don't know of any precedent for saying that there's a waiver or a default on the part of a – of an appellate lawyer not asking for the court of appeal to do its duty. The duty of the court of appeal here, clear under Batson, clear under this Court's cases, clear under Miller L., was to examine all of the relevant facts. It had the power. It had the responsibility to make sure that it had a record necessary to do that. But it had – what did it have? It had the discussion that occurred. The – it made a finding that there was no – nothing improper. What else? Well, it could have – I'm sorry, Your Honor, I don't – No, no, go ahead. I'm just curious. I have – this is a new area for me of – of where an appellate court has to venture out to – to get materials that the attorneys don't ask for. Well, that's – that's, as I said, because the Federal courts are quite different. You expect – I've handled Federal appeals, direct Federal appeals. You expect us, you know, properly to make sure that you have the record. That is not how it works in California. I don't see how you blame the court. That's how – I don't – Because only the court had the power. If it was in the Federal system, if I was the lawyer in the Federal system, I could have filled out a voucher and had that record sent to you. So – so you think the three judges of the panel there going through it are somehow going to find out that there's something else they should have when there's been no motion made? I – I think that – I'm sorry, Your Honor. Go ahead. I think that the three judges of that court, if they were doing as Batson and its progeny required, and looking at the totality of the circumstances, undertaking a comparative juror analysis, would say, we can't compare this because we don't have – we don't even have the entire voir dire transcript, and we don't have any of the juror questionnaires. But the Batson question was clearly raised to the California court of appeal. Did counsel raise the question of a comparative analysis? Yes. It was raised in the briefs? It was. Okay. And what did counsel say about the fact that there were no records there? Did counsel urge the court of appeal to undertake that kind of an analysis? Counsel did urge the court of appeal. What she knew about what was in the records? Or how was it presented? You know, I cannot recount for you what the – as I said, counsel was – it was demonstrably incompetent during this time, but I can't recount for you exactly what she said. But it was an empty question. As, Judge Bybee, as you recounted for the court in Kessler v. Canberra, during this period, 10 years ago, the California courts, as a matter of policy, refused – refused to undertake a comparative juror analysis. So, yes, counsel could have been pounding her head against the court of appeal, saying, you have to undertake a comparative juror analysis. And then she could have gone one step further and say, and you don't have the record to do that. But it would have been empty. It would have been futile. None of it excuses the fact that the court – that the California courts here, as they did in a long string of cases that had come before the U.S. Supreme Court and this Court, refused to undertake the analysis that was required under Batson. They just wouldn't do it. In this case, they said, we won't do it.   And that's the reason why the court refused to undertake the analysis that was required under Batson. Now, there is a finding made by the trial court that there's – I've forgotten what the wording is, but he granted, in a finding of fact, that the prosecutor was not using race as a reason. There was discussion about that. Now, he didn't make extensive findings of fact, but there is a finding. If I understand what you're saying, is even if the district court, the trial court makes a finding that the person is asking the questions without any evil intent and then making decisions without any evil intent, that at that point, the trial judge must say, we're going to have a comparative jury analysis, when they haven't even finished picking the jury? They had finished picking the jury, Your Honor. It was completed at that time. Yes, it was completed. So it would be the responsibility, as I understand it, there were questionnaires? Yes. That were out. And it would be the responsibility of the judge, even though he's made that finding, to do what, the trial judge? Well, to begin with, Your Honor, I don't quite agree that the – excuse me. I was looking. Somewhere here I have the exact paragraph. It was a short paragraph as to what the trial judge said. First of all, I think that it is far from clear that he made a finding in that regard. He started off by saying there's no racism here. That's right. And then he went on to say, because he gave race-neutral reasons. Yes. That is not enough. As Johnson v. California teaches, the question isn't whether the prosecutor gave race-neutral reasons, but whether those were his genuine reasons. And there was never any finding that those were his genuine reasons. I assume the opposition will say, yes, they were, because he says there's no racism here, and then goes on, and it's got to be connected. But at some point – and I understand he could have done a better job. All of the trial judges can do better jobs in these things after they hear the arguments on appeal. But having said that, is – why is it that we say – and I don't understand this. You correct me. Why is it that we say, in spite of finding a fact that there's no racism, that he is required, then, to do something else? To do what? I'm not saying he is – let's – let me assume, Your Honor, that he did, in fact, make a finding, and that was his finding. Yes. He doesn't have to then go on to do something. But in making that finding, he has to be aware of all of the circumstances. He has to look to determine whether there was racism or not. He has to look to see if, you know, this is the most basic analysis in any – if I may – in any civil rights, in any discriminant. He has to look to see if similarly situated people were treated differently. At that point, he can make the finding. In that case. Yes. Yes. And he was present during all of that time. He was – he was present, but it's not clear that he actually reviewed. Because at the time, the California court said, you don't have to look at that. Well, he wasn't present for everything, because there was the weird look in the men's room. Right. He wasn't present for a great deal. You know, all of those demeanor justifications. In the ordinary practice in California, would the trial judge have reviewed the juror's questionnaires? Is that something that a trial judge ordinarily has sort of flipped through? Are they sitting on the desk someplace? I won't speak to ordinary practice, but I'll say that in this case, there was every indication that he did. Because he repeatedly said, I'm going to limit the amount of actual voir dire time, because we're going to go basically on the juror questionnaires. He did most of the voir dire-ing, and he did it off of the questionnaires. He clearly was acquainted with the questionnaires. That's true. The other point, Judge Wallace, that I want to make in response, though, and the important point, is let's say that the judge made his determination, there's no racism. That has to be reviewable. There has to be enough information to review that. And the State Court of Appeal didn't review that. It falls to this Court to review that. It's an interesting comment, that I had always thought when Bass became Blount that we were going to defer to the trial court as the person who's there. But you indicate that there has to be this other, because they have to be checked on. Well, I guess, Your Honor, I think that's what happened in Millerell. That's what happened in Snyder v. California. I mean, Snyder v. Louisiana. That's what happened in Johnson v. California. The Supreme Court in Snyder looked at a record where the trial judge said, I find no discrimination. And it said, well, you know, when you really look at this, there isn't support in the record for that determination based on what Batson teaches. Because, you know, only two reasons were given. One was a demeanor justification that the trial court never specifically credited. We have to put that aside. The other reason that was given was something that was belied by the record. Thus, even though the judge said that, and even though we start out by saying we're going to give deference to the trial judge, we have to be able to review that, and the record has to support that. In this case, the record did not support the justifications that were given. So really what we're doing is we're saying we're going to rely on the fact finder who's there and closest to it rather than a cold record. But we're going to require them to get evidence that we can show they were wrong. That's what it ends up doing. Isn't that why we're asking them to do these jury analysis things? He's standing there. He's sitting there. Well, you know, yeah. And what his duty is, really, instead of – I mean, I did find the passage. It's at my exercise of record, page 49. It is roughly a third of a page. Yeah. What the cases teach is that the trial court is supposed to explain his reasons more than say, oh, you know, no racism here, which is basically what he said. It would be expected that he'd say, yes, I credit this demeanor justification that was given, or I don't credit that, but, yes, I agree that she was confused or whatever. He doesn't. He just says, nah, that leaves you with nothing to go on except to take his word for it. That, you know, as the Supreme Court famously said in Miller-El, yes, we defer it to the trial court, but deference is not abdication. It remains for you to do your job based on the record that is there. And, you know, unfortunately, because the State court of appeal didn't do its job, this Court has to look at that record and see whether it supports the justifications that were given. Counsel, we have taken you way over your time. I'm going to allow you time for some time for rebuttal, but I think we probably should hear, allow Mr. Tamor his time. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. My name is Richard Tamor, and I represent the appellant, Mr. McDaniels, in this  I'm going to be limiting my argument to the ineffective assistance of counsel claim that Mr. McDaniels had. And with the Court's permission, I would like to reserve two minutes of my time for rebuttal. And, Your Honor, what happens in this case is that trial counsel told a witness, a testifying witness, that his client, Mr. McDaniels, wanted her to change her testimony. That's what he told a witness in this case. That is the evidence that came out that the jury heard. In doing that, and all the things that flowed from that, Mr. McDaniels' trial counsel rendered ineffective assistance of counsel under Strickland. It was both objectively unreasonable and Mr. McDaniels suffered prejudice. And quite frankly, as I think about it ---- What was the response of the person who was asked to change her testimony? Her response, Your Honor, was, I can't do that. Wasn't her response that she thought he was joking? During cross-examination of her, she responded that he was jocular and he was a joking person. But that is besides the point. What her belief of whether or not her ---- he was actually asking her to change her testimony is irrelevant. Trial counsel created a situation where his credibility and his client's credibility was questioned, and certainly both the trial court and the district attorney, the deputy district attorney at the time, both indicated that it was not a joke. The deputy district attorney vehemently was arguing that it showed that they were trying, that defense was trying to alter witness testimony, and so did the trial court. It's fairly clear. And quite frankly, if it was a joke, it shouldn't have been allowed into evidence. If it was a joke, it would be completely irrelevant. But neither the trial court nor the district attorney believed that it was joke. And in fact, this was a close case. The issue was not whether or not a homicide was committed or whether or not these two defendants at the time participated. The only issue at the time was whether or not those defendants believed they were committing a theft. The difference between the two is that the former, you would get a 25-year-to-life sentence, and the latter, you would get 15 years to life. It's the difference between first-degree felony murder and second-degree murder. That's the difference. That was the only issue in this case. It wasn't a whodunit. It wasn't whether or not the evidence was there. That was the only issue. And we learned from the prosecutor's argument, and I'll quote it for you. He said, among other things, that, quote, one of the underlying themes in this case is all about credibility. It's all about credibility. Credibility is basically who do you believe and why should you believe that person. That's what this case was about. And so when his trial counsel, Mr. McDaniel's trial counsel, creates a situation where he puts his credibility and his client's credibility and even creates a situation where there is an appearance, an appearance of trying to influence or change testimony, you have a problem. I mean, that is — it's bizarre behavior. I was trying to think to myself the other day, why would — why would somebody do that, even in a joking manner, even in jest? And I can't do it. The explanation was that he was trying to put her at ease. He was trying to make her feel comfortable with himself, and that almost everything he said as he was — as they were seated there was said in a jocular fashion, which would be a way of saying, everybody calm down. I'm just here to — just want to talk to you. Yes. That's correct. But in the universe of ways to establish rapport with a witness, this is one thing. That's a violation of the Sixth Amendment to joke?  And I'm not saying that the attorney testified that your client wants a witness to change her testimony, to lie, to perjure herself. But she didn't take it that way. She said he was joking. Whether or not she took it that way is irrelevant. The jury heard it. The trial court believed and the deputy district attorney argued that — that it showed that they were trying to — it showed a — an attempt to dissuade witnesses. That's the exact language that both the trial court used and the deputy district attorney used. If it was just a joke, it should not have been relevant any — any more than a knock-knock joke would have been during the conversation that — that trial counsel had with the witness. Assume that we agreed with you. What difference would it have made in this case? The second part of the Strickland standard is prejudice, that a case would have come out differently. How would you argue that it would come out differently if he didn't have this little one-liner at the beginning, he wants you to change your testimony? Well, a couple of responses, Your Honor. This, as the court will recall, this case was tried twice. And in the first trial, the court of appeals — well, let me back up. In the first trial, it was a 20-day jury deliberation, 20 days. And again, it is not — in the first trial, the jury did not hear evidence about Mr. McDaniels allegedly trying to dissuade a witness in changing testimony, 20 days. In the second trial, it was three days. Again, we weren't talking about a whodunit, whether or not murders committed, whether or not these defendants were involved. They were. The issue was whether or not they, the defendants, believed they were participating in a robbery or a theft. In the earlier trial, it took the jury 20 days to determine whether or not, before they returned a guilty verdict. After hearing testimony that Mr. McDaniels attempted to dissuade a witness, it only took them three days. Again, this is about credibility. Anything that bears on credibility when there is — that is the only issue, when credibility is the only thing that will determine whether or not these defendants will receive a first-degree felony murder conviction or a second-degree felony murder conviction, the trial counsel's acts, especially something like this — Kennedy, you're still going back to your first premise. But if I understand you correctly in answer to my question, it's the amount of time it took the first jury and the amount of time it took the second jury that tells us that there was a Strickland prejudice. Yes. Okay. And I don't know if I can reserve the rest of my time. Yes, of course. Thank you, Mr. Timore. Let's hear from the government. Mr. Beaver. Thank you, Your Honor. Excuse me. May it please the Court, Arthur Beaver, for Respondent Appellee Richard Kirkland. I don't know what the Court's preference is regarding the order of the issues that I'll address, so I'll start off by addressing the most recent one, the ineffective assistance of counsel claim. As we indicated in our brief, the Court's review of this claim is doubly deferential. The reviewing court must determine what arguments or theories could have supported a recent State court decision and then whether those theories were reasonable. Here, as we indicated in our brief, there are strong arguments on both prongs of this Strickland test. First, the defense counsel, Mr. Levy's jocular talking to a potential prosecution witness. His jokes could have been an attempt to make her at ease with him. I couldn't think of any other. Why was this even raised at the trial? Presumably because the prosecutor had believed that the defendant was trying to alter Ms. Ingram's testimony. The fact that she believed that Mr. Levy had been joking came out on cross-examination when she was testifying. Perhaps the prosecutor hadn't realized that that's what her opinion was. I don't know what his belief was and what his theory of presenting that aspect of her testimony was. He was the lawyer. Levy was never charged with any such act, was he? Mr. Levy, I do not believe so. There's nothing in the record indicating that. Moreover, Ms. Ingram testified that he said everything in a jocular manner, that she thought he had been joking when he told her that, that she already knew that the defendant wanted her to change her testimony, which would have been obvious to almost anybody because she's a prosecution witness. Moreover, there's some dispute that Mr. Levy actually made such a statement when the defense called his investigator. The investigator said, I don't recall such a statement being made. I've done 25 interviews with Mr. Levy. He's never, ever urged anybody to change their testimony. We aren't going to decide that, the factual issue. But what the person who was allegedly asked the question remembered it. She did. And she assumed it was done as a joke. So this record shows. So what do we do? Do we say, oh, it didn't happen? We can't say that, can we? Well, you have to weigh her testimony that such a statement occurred with the investigator's testimony that such a statement did not occur. He didn't say it didn't happen. He said, I don't recall hearing it. There's a lot of difference between I don't recall hearing it and it didn't happen, don't you think? Correct. But his testimony would go to the jury's consideration of whether such a statement had been made and in what manner. So if the jury determined that, hey, we don't believe that the statement was made, maybe she's confusing it with another joke that he made or something like that. Here we've got an investigator saying he doesn't recall. He's a trained investigator. The defense attorney has never made such a request of any witness. So perhaps on the prejudice prong of the Strickland analysis, that's another argument, that the jury's consideration of this fact was minimal at best. And contrary to what opposing counsel has argued, the case against the defendants was very strong. As we indicated in our brief, you know, Mr. McDaniels admitted that he participated in the offense. His handprint was found inside the car. He was identified from the theft of that car. Did you try this case? No, I did not. The prosecutor in this case was Mr. Lowe from the Alameda County District Attorney's Office. And I met Mr. Lowe in person, not related to this case, but I did not personally try this case. Considering those arguments, those reasonable arguments, there can be no finding of ineffective assistance of counsel in this doubly deferential review because those theories are reasonable. Perhaps they're not ones that this Court, you know, personally agrees with, but fair-minded jurists could arrive at that conclusion, and that forbids a finding of bias here on habeas review. Turning now to the Batson claim, as we indicated in our brief, we don't believe there was any Batson error here. Regarding Juror Andrews, the prosecutor stated that Before you get to the individual jurors, which I am interested in hearing about, I want to explore what is the duty of the Court of Appeals here? As this Court has made clear in its cases, Miller L2 and Anderson established a not established, clarified Batson to require that, not require, excuse me, to suggest that comparative analysis of jurors should be done. It's more than a suggestion in the URL. Correct. Yes. That it should be done on review to analyze a Batson claim. Part of that requirement is Why isn't that then clear error on the part of the California Court of Appeal? Because here in the California Court of Appeal, there was no denial of hearing a Batson claim. There was no denial of But there was no comparative analysis conducted, as Miller L performed. That's correct. The comparative analysis that – well, it's partially correct, Your Honor. There was comparative analysis suggested to the Court of Appeals. It does address it in its opinion, the very last paragraph discussing the Wheeler claim. It didn't even have the records in front of it, so I couldn't possibly have conducted the comparative analysis that the Court itself, the Supreme Court itself conducted in Miller L. and that we conducted in Kessler v. Canberra. It had sufficient records to consider the comparative analysis arguments suggested by the defense, but not enough to conduct a It didn't have the juror questionnaires, right? Okay. Well, that's pretty fundamental, right? Especially since the district court, since the trial court said, we're going to move this along because I've got the questionnaires. Correct. The trial court That looks like a pretty important piece of evidence, which the Court of Appeal did not have in front of it. Correct. But even without the Court of Appeal's decision, we do have, as this Court ruled in Cook v. Lamarck, this decision on the third step of the Batson test is reviewed under 2254d-2, which means that you can look through to the trial court's decision. And the trial court did have the questionnaires. It did observe the demeanor of But there's no evidence there that the trial court looked at anything, and there were things that the trial court clearly missed. That would probably be the case in almost every trial. Sure. Here, the trial court did not miss the prima facie case being established, the prosecutor's statement of reasons regarding his decision to preemptory challenge jurors Andrews and Reeves, and it did not skirt its duty to evaluate those prosecutors, the prosecutors' proffered reasons in determining whether there was invidious discrimination going on during the jury selection. In this case, moreover, particularly when we're dealing with jurors Andrews and Reeves in isolation as opposed to the other jurors that the defense is suggesting we consider, both of them, the prosecutor offered reasons based on their demeanor. So a comparative analysis would be of limited utility on those grounds. The fact that Juror Reeves had given the prosecutor an odd look or that Ms. Andrews In a restroom where the district court couldn't see him. Just outside the, yeah, outside the presence of the judge, but in the courtroom. And the fact that Ms. Andrews stated reason was that she was. Weirdness seems to be a recurring theme in the prosecutor's reasons, doesn't it? It does. I'm not exactly sure what that means. I don't know what the trial court thought that was. I would assume that it meant that he was uneasy with that juror sitting on his desk. Yeah, but being uneasy is just not going to be adequate. Correct. But that's why he stated in particular reasons on each of these jurors. So for Juror Andrews, he described her as hesitant, intimidated, and weird. Yeah, she got some very strange questions. She got some compound questions that wasn't clear that she could answer yes or no, because no matter whether she answered yes or whether she answered no, she was going to be answering incorrectly because there were compound questions. That's correct. On the cold record, the questions with all the hyphenates where he's, the defense attorney switches the phraseology. It becomes impossible for her to answer the entirety of the question yes or no. Regarding the last part of the question, the do you understand that they're innocent until proven guilty, that's when she indicated no. But on the cold record, yes, there are these issues. That's why the trial court's decision should be given deference, because it was in the best position to view the juror's answer and the prosecutor's. What do we do with Juror Hilton? Juror Hilton, this is an interesting case. First off, it's our position that the prosecutor's decision to strike Juror Hilton shouldn't be relevant. Juror Hilton was not included in the certificate of appealability, and I'm unable to find any authority indicating that a comparative analysis between two stricken minority jurors would be of any use whatsoever. But it's pretty clear that the reason that was raised was, I mean, the reasons that were explained were wrong, that his son wasn't a, hadn't been convicted of a crime. He was a victim of a crime. That there was a misunderstanding there, and I mean, that just looks like a pretty obvious error, doesn't it? Again, based on the cold record, we have no understanding of what the underlying nature was, whether there was a co-conspirator or a victim or a witness somehow involved. But even if he had been, even if he had been a perpetrator rather than a victim, it was clear that there were other jurors who were seated who were not African-American who had children and other relatives who were in jail and had been prosecuted, and they were seated. But there were also other stated reasons for the prosecutor striking Mr. Hilton, including the fact that he had sat on a civil jury that had been unable to reach a verdict. Particularly, as the appellants pointed out, this was a case that had been retried. The prosecutor was very aware, and he stated during the Wheeler motion, that having the case retried, he had discussed the case with the juror, at least one juror, from  And perhaps that's what he was he was. He stated, I am concerned about that. So in cases like this where you have a potential juror who was sitting on a civil trial and had been unable to reach a verdict, I believe he also stated some other reasons. But he also passed Mr. Hilton several times until he realized, you know, I'm not essentially comfortable with him being on this jury. So, Mr. Hilton, I don't believe that Mr. Hilton's striking demonstrates invidious discrimination. Particularly when you consider the other circumstances of the case. Here you have a black prosecutor and you have three black people, three black men, serving on the seated jury. As we indicated in our brief, that supports the finding that the prosecutor the presence of similarly situated minorities on the jury cuts in the State's favor, I believe is the phrase from the cases, that there was no invidious discrimination against that group by the prosecutor here. But turning back to the two jurors in the COA, Juror Andrews was challenged for a demeanor justification. The trial court, after hearing those reasons, credited them and found that there was no racism. Regarding Juror Reeds … Yeah, although when the prosecutor's asked about her, sort of the first thing he refers to is that, well, he knew that she was a person of color, but wasn't sure she was really black, might have been something else, maybe Indian or something else. That's correct. Apparently, she listed several races on her questionnaire, and the prosecutor was probably, and again, this is only going off of a cold record, making a record regarding the race of Juror Andrews, perhaps in the attempt to dispel any idea that he was invidiously discriminating against anybody by saying, I didn't even know that she was black, so therefore, it would have been impossible for me to strike her. In any event, I think that it was not a statement of a reason, but it was a statement of a reason. He was not striking her because she didn't look black. He was just making a record on her appearance because there is no record of her appearance otherwise. Well, of course, if he had done that, then that would be an obvious violation of Batson. Correct. Yeah. Which leads me to a tangential point. In the briefing, appellants have referred to the prosecutor's obvious fixation on race, which I believe is probably true because he's in the middle of a Batson-Wheeler motion. The highlight of the issue in the hearing is the juror's race and whether or not he is being a racist. So I believe that his fixation on describing the appearance of jurors that he's stricken or his reference to jurors that have put question marks or left spaces blank on the questionnaire regarding their race doesn't demonstrate an obvious fixation on race except as required for the nature of the hearing in which he was responding to a charge of racism. One last thing I'd like to talk about is the record on appeal. Reversal is not required simply because no complete voir dire record was presented to the California Court of Appeal or this Court or the district court. As I've explained and as we explained in our briefing, the Court should defer to the trial court's ruling. The trial court had all of the records necessary to perform every task that it was required to do. Isn't that responsibility to review the last reasoned decision, though? That's correct. That would be the California Court of Appeal. It would. And they're the backstop. They're the court that has the right to say to the trial court, we know it's hard to stop in the middle of a trial and pull out the juror questionnaires, but that's what Miller L. requires, and if you didn't do it, at least we'll have to do it. And somebody's going to end up having to do it after Miller L., so it can either be the trial court or it can be the Court of Appeal, but that's the decision we have to review, not the trial court's decision, right? That's correct. But when a reasoned decision is based on a lower court's reasoning, it is sometimes permissible to consider the lower court's reasoning. Moreover, as I explained in Cook v. Lamarck, the deference owed here is down to the factual determination made by the trial court. And that's why in the recent cases from this Court and the U.S. Supreme Court, the high courts have explicitly said you owe the trial court deference. The trial court was there. It observed the demeanor of the jurors. It observed the demeanor of the prosecutor when he was offering his reasons. It's in the best situation to judge a case. No, the difficulty, though, is usually somebody has the record from the trial court. That's correct. And we don't. But unlike Ayala, which we both wrote letters about, this is not a case where the records were lost or destroyed before a State appeal was completed. There's no indication of, at least that I received from the trial court, on when the records were destroyed. But I would presume that they were not destroyed or lost the day of or the day after trial, as it was the case in Ayala. In this case, when this consideration was going on in the trial court, did the defendant's questionnaires to impeach or, in other words, interfere with the prosecutor's contention that it was a race-neutral determination? If you're referring to any argument that was made in response to the prosecutor's stated reasons, they were very brief. I believe Mr. McDaniel's attorney argued that one of the jurors, I believe it was Mr. Reeves, was not hesitant when he answered. Yes, there was a different view of whether he was or wasn't. Hesitant when he answered that one question regarding sympathy for defendants. No other argument was made. Mr. Jenkins' counsel just submitted the matter. No mention was made of comparing questionnaire answers to anything else during the hearing either. And I would like to address one of the Court's questions for the appellants, which was whether it's California practice for the trial court to be looking at the questionnaires. I cannot speak to general California practice or the practice of this particular judge, much less on this particular occasion. But in my limited experience in trial courts in Alameda County, it is their practice to have a copy of the questionnaires as they are vordeering the trial court, to have a copy of those questionnaires and to be using them during that. I didn't understand it to be – your point to be inconsistent. I understand your point to be consistent with the opposing counsel's comment. What about the question of what gets sent over to the court of appeal on – once the appeal has been filed? Well, again, here I feel that it is the defense's obligation to raise a comparative analysis claim. They would have to go to the court of appeal especially because the records – those records are not automatically going to be sent to the court of appeal. That is my understanding of what the practice is. And there is a difference between the California practice and the Federal practice in that regard. Is that correct? I'm unfamiliar with the Federal practice, but I would believe – Okay. So the trial counsel here did not have the opportunity of designating those portions of the record they wish sent to the California court of appeal. Is that correct? They had the opportunity not to designate it, but to request the court of appeal to audit it. Sure. That's the additional step of going to the California court of appeal and saying we think that there's other records that you need. But they would have had to have taken an affirmative step that would have not been in the ordinary course of the way that the court of appeal reviews these things. It would have been an extra step, but it also would have been in the ordinary course of presenting a Batson claim. Should they have felt that any of those records were necessary, then, yes, they could have presented a request to the court of appeal. They, unlike Boyd v. Newland, they did not. You know, here's – although this was the same court – If the California court of appeal had been looking at Miller L. in this case, if they had been reading Miller L. closely, as we did in Kessler, might the court of appeal sua sponte have said, you know something, I think we need to look at those questionnaires. It is my sincere hope that they would have at least assembled a complete record, including the questionnaires and all of the dates of – But if they had looked at Miller L., wouldn't they have said, wow, this is a pretty tough opinion by Justice Souter. I think we're going to have to look at those questionnaires, even though we didn't – even though we didn't get them. Perhaps they should have. And in a different case – But if they did, isn't that the kind of thing, then, that we can review and can reverse under AEDPA? Theoretically, yes.  And I understand that David would like to take a soft position on this one. I'm unwilling to just say that, you know, it would be demonstrated error based on these facts. In the particular circumstances of this case, there was no request made. The trial court had all of the – I mean, I think the trial court is in a really difficult position after Miller L. I think it's a very hard thing to ask of a trial court to stop and say, let me spread out all of these questionnaires and do the kind of examination that you did in Miller L. It's a great burden on them. In some ways, it's a little easier for a court of appeals working off a paper record to do that. I think that's a hard thing to do as well. But I think it's really difficult for a trial court to assume that burden. When, as here, the stated reasons for striking the jurors were based on their demeanor, both inside and outside of the courtroom, I'm not sure that that would be such a great burden for the trial court. If the stated justification had been, as in Mr. Hilton's case, there was something in your past that, you know, affected you or biased you, then you can go into the questionnaires and the other sections of the voir dire and compare non-minority jurors that were seated. Or, as Griggs suggested, you can compare jurors, I forget what his suggestion was, but it expanded the scope of comparative analysis slightly. It suggested that might be helpful. However, here you have a very person-specific demeanor. This person gave me a weird look, gave me a strange look. I'm particularly aware of receiving strange looks as a black person. That's why I noticed that one. With Ms. Andrews, again, it's the prosecutor's interpretation of her behavior. Did the prosecutor strike anybody who's not African-American? I believe he struck several people who are not African-American. Okay. And did he ever use the word weird in connection with anybody else? I'm not sure, Your Honor. Okay. It's possible he only used the word weird in connection with African-American members of the voir dire. I am not familiar. I did not conduct enough in-depth research on whether or not he used that word. I'd be happy to provide additional briefing if you'd like to give me an opportunity to examine the record and submit additional briefing on that issue. But in this case, a reversal here would be not on a finding of a Batson violation, but on the speculation that the California court of appeal, had it had the whole record, could have found another juror that was similarly situated, that was allowed to serve. And that kind of speculation shouldn't be the basis for the granting of a writ. The defendant has the ultimate burden of demonstrating invidious discrimination. And based on the trial court's crediting the prosecutor's race-neutral reasons, based on the demeanor of the jurors the trial court was able to observe, there was no Batson error. And for that reason, we would urge that the district court's ruling be affirmed. Unless the Court has any question on any of the issues presented, I'll submit on the papers. Thank you, Mr. Beaver. I think it was very helpful. Thank you. I don't think there are any further questions. Your Honors, I will try and make it brief. You covered a lot of territory with Mr. Beaver, and there are several points I'd like to respond to there. I'll start quickly by saying that I believe that Mr. Beaver has misstated the holding of Cook v. Lamarck, which didn't say that this Court defers, regardless of whether there's a comparative juror analysis, this Court defers to the trial court. What Cook said was that where there's no comparative juror analysis in the court of appeal, there still can be deference because, quote, the relevant evidence is found in answers to juror questionnaires and a transcript of voir dire, both of which were before the California court of appeal. What Cook said is, well, if the court of appeal has the entire record, then we can assume that they carefully looked through it and we can defer. There's also the point that Cook appears on that score to conflict with earlier Ninth Circuit authorities, specifically Green v. Lamarck, but I don't think we need to get into that now. The demeanor justification that Mr. Beaver repeatedly referred to was very clearly dealt with in Snyder, which said, unless the trial judge specifically credits the demeanor justification, the reviewing court can't give it any weight. The trial judge in this case did not specifically credit any of the due any justification at all, and certainly not the demeanor justifications. Those have no weight in terms of the review. The question of Juror Hilton, I think Mr. Beaver said that there is no other – that it's not relevant and there's no authority that the court can consider it. Among the plentitude of authority is this Court's decision in Kessler v. Canberra, also in Ali v. Hitchman. Roberts. Which jurors in your view are the ones that are most vulnerable here? Who did – who do you think the prosecutor excluded on the basis of Rice? I think very clearly – And without any other cause? Andrews, Reeves, Hilton, and Woods. Well, Woods is pretty – Woods is – he's got his own problem. He said he thought the police planted evidence and that he would have been a victim of police brutality. That sounds pretty much like cause, doesn't it? Well, yes, but – I mean, if we can't credit that, then we ought to get out of the business. Since the clock is ticking down, I'm going to put Woods aside. I do, however, want to talk about Hilton, because what the DA said about Hilton is that the decisive factor, what made up his mind about Hilton, is that where there was a blank on the questionnaire about Race, he filled in a question mark. However, the same DA – that was the decisive point. The DA had no problem with two white jurors who left that same question blank on their questionnaires, or a third non-African-American juror who just wrote something unintelligible in it. This Court's case law and the Supreme Court case law is very clear that where you have disparate treatment in that sense, where you have a reason given that applies with equal force to non-African-Americans. And I think that Hilton presents the strongest case for you as to who was – as a juror who was – potential juror who was excluded on the basis of Race. I think that – I think that perhaps Andrews presents the strongest case, because with Andrews, there was an uncredited demeanor justification. There was that very weird comment about, I didn't – you know, she doesn't even look black, and Mr. Beaver's interpretation is absolutely insupportable. The AG – I'm sorry, the DA knew she was black. He said so because it was in her questionnaire, which he reviewed before he awarded her and before he struck her. So he knew she was black. But there – so there are those two – there are those two justifications which at best don't support the strike. And then there is the final, the only substantive justification, is she – her answers to the questions showed that she didn't understand. If you review her answers to the questions, it is absolutely clear that she understood, and she was responding to unintelligible questions. I'm sorry, Judge Ferris. Breyer, what would be the remedy if we agreed with your position and your view? What would be the remedy would be to issue the writ, because in this case, you know, one of the things that – and I think the most important thing that was said when you were talking with Mr. Beaver is that at some point, someone has to look at the questionnaire, someone has to look at the record, perform that backstop function, and determine whether there was a Batson violation here. Unfortunately, because the California court of appeal did not do its job, that falls to this Court. Do we have all the questionnaires in our record? You don't have all the questionnaires. I would submit on that basis, you can't say, oh, there was no racism here. But I think that there is enough evidence in the record to – Do we have all the questionnaires for the – for the relevant jurors? No. You only have the questionnaires for the jurors who were actually seated. So you don't even have the questionnaires for Andrews, Hilton, and Reeves. What – how – do we have to make some assumptions? I don't think so, Your Honor. Well, what does the court of appeals can do? There's no indication these even exist anymore. That – that the rest of the questionnaires don't? I'm saying that there is enough evidence. You can't look at the totality, which is what you'd have to do to be able to say, oh, there's no racism here. But there is enough evidence, based on looking at the justifications that were given and comparing them to the evidence that you do have, to be able to say those were pretextual. You're saying when the prosecutor says, Juror Hilton left the question about race blank, we'll take his word for it, and then when we find other jurors who were seated and whose questionnaires are in the record who also left it blank, that that suggests to us that it was a very – That's a very – that is a classic red flag of a discriminatory intent there. But suppose – suppose we can't get the questionnaires. And I'm saying – and I'm saying there are two – that's a two-part answer. If you can't get the questionnaires, you can't say there was no racism. But without – You can't say there's no record of racism. No. I think you can say there is a – I think you can say there is a record of racism based on the evidence that you do have. Based, for instance, to take the example that Judge Bybee just gave, the record that you do have, you don't have Hilton's questionnaire, but you do have the prosecutor representing that he left that question blank. And the record that you do have showed that two of the people – three of the people, really, that he allowed to be seated also left it blank. That is evidence. That is sufficient evidence to demonstrate a discriminatory intent. Doesn't it depend on what else there is? I think at the point that you – that all of the – that there is no – that there is no valid justification given. And that there are multiple justifications that are provable on the record to be pretextual, to be false. So we're saying that the finding of fact, assuming it's a finding of fact by the district court, is proven to be clearly erroneous based upon these things? You mean by the trial court, Your Honor? Yes. What you're saying is that the – is that the record before the court does not support the ultimate determination, if, in fact, it was an ultimate determination. Which court? Marquardt? This Court. It doesn't support, but we could also say it doesn't? But it does. But it does demonstrate. What do we do – what do we do with Burks v. Borg? It seemed to me Judge Kaczynski was sort of pushing back on these – there was a comparative analysis of jurors' issue, and he was pushing back and going very strongly into the trial court's finding, even citing Palmer v. Estelle, a very well-written opinion. And it just reads as a complete pushback. Now, he's – he wasn't in bank, but that doesn't hesitate from the third – from the three-judge panel making this determination. You haven't had a chance to mention to us how you would treat Burks v. Borg, but it strikes me that of all of our cases, this is the one that would give you the most trouble. Well, Your Honor, I don't recall that being a being in the briefing. And I – although I did read that case. Yeah, I found it. It's been – it's been a long time. And so I can't speak extemporaneously to it. I would be more than glad to submit a – you know, an additional letter addressing that, and I'm sure that Mr. Beaver would as well. Yeah. If we need your help, we will, but I just wanted to give you a chance. My recollection, though, if I may say, is that that was a different case in that the trial court there explained what his reasons were. He didn't just say, oh, no racism here, no discrimination, nothing to see here, folks, move on, which is at best what the trial judge said here. If you can defer to that sort of blank assertion, if you're required to defer to that sort of blank assertion, there is absolutely no purpose in having Federal – the writ of Federal habeas corpus. You know, it strikes me that we're moving in a direction that gives us a lot of difficulty. Let me tell you my story. I know we're running you over, but I've sat as a trial judge, and I've had to determine whether a witness is telling the truth or not telling the truth, and it's a very difficult process. But if I were to sit down and tell you why it is that I believe him or why I don't, it would be very, very difficult. I think that's a common thing with people. I mean, you meet people, and sometimes you say, I don't believe what he's telling me, but you couldn't, you know, say it's because of this or because of that. But here, we're asking the trial judge to tell you why. That's what you're asking, and that somehow, if we have these comparative analysis, we'll be able to tell that the judge made a mistake, cross-examine him, that he didn't put weight properly. And the Burke case goes back to saying that the trial judge, we have to defer. That's the point of the trial judges. And it's a difficult question, and it makes Batson become the big part of the case where it should be the beginning part of the case. And I don't know how we handle all of that. Frankly, I'm sorry, Your Honor, I didn't mean to cut you off. I'm just talking, I wanted to get your view because it's in the back of my mind. You know, I quite understand and agree with what you're saying. I think what the Batson cases illustrate most vividly, and it's a conversation it would be great to have some time, is that this whole system is broken. You know, and there are several Supreme Court justices over the years, a sort of a revolving cast of them, that said, as long as we have peremptory challenges, unbridled peremptory challenges in criminal cases, we're going to be going through this incredible, almost topsy-turvy analysis. But as long as we do, there's no other way. The answer can't be to just say, we're going to write a blank check to the trial judge who is going to stand for election and perhaps face a district attorney if he asserts that somebody in that office has been a racist. We're just going to write a blank check and says, if he says there's no racism here, there's no racism, we can't do that. As long as we have this system, and it is not necessarily a workable system, but it has to be a reviewable system. Otherwise, there is no bridle on the every day, on the every day use of racial criteria, and I believe it happens every day in selecting jurors. So what you're saying is race is going to be an exception, and in every case in which a black juror is challenged by either side, we're going to have to go through this whole process. Well, it's, you know, it doesn't necessarily have to be that bad. I've read a lot of bats in transcripts. For some reason, I keep ending up with these cases. And actually, that's fine with me, because I think this is a really, really important, really valuable area. But many, most of them, the trial judge says, okay, I saw Juror Andrews, and I agree. You know, it may not be clear on the naked transcript, but I agree. I mean, she was confused. I wouldn't have selected her. Trial judges often say something like that. Or, yes, there was something weird about that guy. I can understand why you said that. Trial judges often say something like that. But when the trial judge is silent on it, you can't just import into that silence an agreement with every reason that the prosecutor gave. Well, as the Board case indicates, the lawyer is not required to believe what the witness said.   I'm just saying that they have the final say in representing a client before the court, and sometimes they guess right, sometimes they guess wrong. I suspect that we're not going to answer that question today, but thank you for your help. Thank you for your questions, Your Honor. Judge Ferris, did you have a question? No. I was going to say, in your experience, you probably found you had a better case when all the members of a certain race were eliminated and members of another race were seated. It made a better argument for you, I suspect, than one where some blacks were eliminated but some blacks were seated. It's true that it's cleaner if he had eliminated all ten, although in Alameda County, to bump every African-American off the jury would be quite a feat. The fact that he bumped 70 percent of the African-Americans is pretty impressive, given that he bumped less than 30 percent of the other jurors, and he had a pretty clear, obvious reason, plain on the record, for the other jurors that he bumped, not for the African-Americans. I think the case law is clear enough that a seriously disproportionate exclusion is enough to support an inference of discrimination, even if he didn't clear the decks. You're way over it. Okay. I am way over it. Thank you, Mr. Chief Justice. Mr. Tamura, you have reserved some time. Your Honor, unless the Court has any questions, I'm prepared to submit. I don't believe that we do. We want to thank all counsel for the arguments. A very interesting, very provocative case. It was the case was well briefed and it was very well argued by both sides. Thank you very much. The reason he suggested that you approach that as a recorder, not an amplifier. So from the back, it might not have picked you up, and so you need to be. We didn't want to miss anything you said, Mr. Tamura. We thank all counsel. We are in recess until tomorrow. All right.
judges: Wallace, Farris, Bybee